UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RADIUS MARKETING GROUP, INC., | ) | |
| | ) | Civil Action No. |
| Plaintiff, | ) | 24-10106-FDS |
| | ) | |
| v. | ) | |
| | ) | |
| CONTINENTAL CASUALTY COMPANY | ) | |
| d/b/a CNA INSURANCE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS

SAYLOR, C.J.

This is an action arising out of an insurance coverage dispute between Radius Marketing Group, Inc. and Continental Casualty Company.  Jurisdiction is based on diversity of citizenship.

The complaint alleges that Continental Casualty refused to cover certain losses sustained by Radius after a sewage pipe burst underneath a warehouse and caused damage to products that Radius stored there.  It alleges that the refusal to cover those losses was a violation of Mass. Gen. Laws ch. 93A and 176D, a breach of contract, and a breach of the implied covenant of good faith and fair dealing.  It also seeks a declaratory judgment that Radius is entitled to coverage under the contract.

Defendant has moved to dismiss Count 2, which alleges a violation of Mass. Gen. Laws ch. 93A and 176D, and Count 4, which alleges a breach of the implied covenant of good faith and fair dealing, pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  For the reasons set forth below, the motion to dismiss will be denied.

I.      **Background**

The facts are set forth as alleged in the complaint unless otherwise noted.

A.      **Factual Background**

Radius Marketing Group, Inc., is a Massachusetts corporation that supplies printed promotional and marketing products to customers.  (Compl. ¶¶ 1, 25).  Its principal place of business is Rockland, Massachusetts.  (*Id.* ¶ 1).

Continental Casualty Company is an Illinois insurance corporation.  (ECF No. 2, Corp. Disclosure at 1).

As of February 1, 2023, Radius leased space at a warehouse facility located at 401 VFW Drive, Rockland, Massachusetts, where it stored advertising products, materials, supplies, and other goods.  (Compl. ¶¶ 3-4).  Continental Casualty provided insurance coverage to Radius for that facility for the period from April 1, 2022, to April 1, 2023.  (*Id.* ¶ 5).

On February 1, 2023, a septic line burst underneath the concrete floor of the warehouse, causing raw sewage and septic effluent to flood the warehouse and damage Radius's products. (*Id.* ¶ 7).  The same day, Radius reported the incident to its insurance agent, Rogers and Gray. (*Id.* ¶ 8).

Continental Casualty first contacted Radius about the incident on February 7, 2023.  (*Id.* ¶ 9).  On February 10, it assigned an adjuster and requested certain initial documentation, which Radius provided.  (*Id.* ¶ 10).  Also on February 10, City Salvors, a consultant for Continental Casualty, contacted Radius concerning the "contents portion of the claim."  (*Id.* ¶ 12).

By February 14, 2023, Continental Casualty had retained an expert, Envirotech Laboratories, which issued a report confirming the presence of raw sewage in the water that had flooded the warehouse.  (*Id.* ¶ 13).  Continental Casualty shared those results with Radius on February 24, and advised Radius to "discard any of the product that came into direct contact with

2

the water" and to "[r]etain and set aside any product that did not come into contact with the water." (*Id.* ¶ 14).  Radius discarded certain products and set aside others, as instructed. (*Id.* ¶ 16).

On February 27, 2023, Continental Casualty informed Radius that it had retained JS Held, LLC to perform environmental testing and to run test swabs on the products and materials that had not been directly affected by the water to determine if those items were contaminated. (*Id.* ¶ 17).[1]

On March 17, 2023, Radius provided Continental Casualty with a mitigation estimate from Able Restoration.  Continental Casualty allegedly rejected that estimate and advised Radius that mitigation costs were not covered under the policy; that addressing mitigation was Radius's responsibility; and that any such costs would need to be recovered from the lessor of the warehouse. (*Id.* ¶¶ 22, 23).  It did not assign a consultant to address mitigation measures, informing Radius that "if any (items) need to be discarded due to irreparable damage, please photograph and inventory them first." (*Id.* ¶ 22).  Radius sent mitigation estimates to the lessor, who advised Radius that it would either clean the entire warehouse once all contents were removed or one side of the warehouse at a time if the products were moved to the alternate side. (*Id.* ¶ 24).

By March 23, 2023, JS Held had completed its testing and determined that sewage pathogens were present on two out of eleven samples collected. (*Id.* ¶ 18).  Specifically, JS Held confirmed that sewage pathogens were present on wood pallets located on the floor of the warehouse and on top of a pallet with contents sealed in stretch wrap. (*Id.*).  JS Held concluded

---

[1] Continental Casualty also hired a consultant, Nelson Forensics, to conduct a site evaluation to determine the cause of the loss. (*Id.* ¶ 15).  The forensics evaluation was performed on February 28, 2023, although Radius was not made aware of the final findings. (*Id.*).  However, the parties agree that Radius had no responsibility for the events causing the loss. (*Id.*).

that "additional cleaning and the removal of visible water damaged contents is recommended within the warehouse." (*Id.*).  However, neither JS Held nor Continental Casualty directed removal of the remaining contents in the warehouse.  (*Id.*).

Radius, which was concerned about the impact of airborne contaminants on the product remaining in the warehouse, retained Envirotest Lab, Inc. to perform air-quality measurements and surface testing.  (*Id.* ¶¶ 19-20).  Some time later, Envirotest conducted air and surface sample analyses.  (*Id.* ¶ 20).  Its report concluded that the presence of microbial volatile organic compounds was elevated throughout the warehouse; noted that obvious mold and sewage remains were present on all materials, boxes, and box contents; and recommended that all materials in the warehouse be disposed of immediately "due to the presence of sewage and sewage caused mold."  (*Id.*).

In June 2023, JS Held returned to the warehouse and confirmed the findings of the Envirotest report.  (*Id.* ¶ 21).  However, it recommended that Radius only dispose of the open boxes on the west side of the warehouse.  (*Id.*).  The complaint alleges that JS Held has admitted it did not inspect the sealed boxes on the west side of the warehouse during its second investigation.  (*Id.*).

On three occasions not specified in the complaint, City Salvors, a consultant for Continental Casualty, visited the warehouse.  (*Id.* ¶ 26).  It never directed Radius how to manage the remaining products.  (*Id.*).  The complaint further alleges Continental Casualty did nothing to ensure that the products and equipment in the warehouse that were not initially discarded were not cross-contaminated.  (*Id.* ¶ 25).

At some point, Continental Casualty divided Radius's claimed loss into four phases.  (*Id.* ¶ 27).  Phase I concerned items immediately discarded by Radius.  (*Id.*).  Phase II concerned

items also discarded by Radius according to the directions and initial (March 23) report of JS Held.  (*Id.*).  Phase III concerned items not discarded originally or in response to the initial report of JS Held, but that were stored in trailers by Radius.  (*Id.*).  Phase IV concerned the balance of the claim, which consists of hours lost by Radius, business losses, and additional costs and expenses not included within the first three phases.  (*Id.* ¶¶ 14, 27).  Radius alleges that two of its largest clients that had products stored in the warehouse terminated their contracts as a result of its failure to provide products because of the incident.  (*Id.* ¶ 31).

As of November 2023, Continental Casualty had paid $1,282,736.57 to Radius for the loss.  (*Id.* ¶ 28).  Radius has demanded additional compensation from Continental Casualty for Phases III and IV.  (*Id.* ¶ 32).  Continental Casualty has declined to pay further, in part because it has determined that the inventory and product that was not discarded in Phase I or Phase II is subject to a $25,000 mold damages cap under the policy.  (*Id.* ¶¶ 28, 32).

According to the complaint, Continental Casualty did not raise the issue of the mold exclusion while the claim was being handled.  (*Id.* ¶ 29).

### B.     Procedural Background

On December 14, 2023, Radius filed a complaint against Continental Casualty in the Plymouth County Superior Court.  The complaint seeks a declaratory judgment (Count 1) and alleges a violation of Mass. Gen. Laws ch. 176D and ch. 93A (Count 2), breach of contract (Count 3), and breach of the implied covenant of good faith and fair dealing (Count 4).

On January 12, 2024, Continental Casualty removed the action to this court on the basis of diversity of citizenship under 28 U.S.C § 1332(a), (c).

Continental Casualty has filed a motion to dismiss Counts 2 and 4 for failure to state a claim upon which relief can be granted.

II.     **Standard of Review**

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

III.    **Analysis**

A.      **Violation of Massachusetts General Laws Chapters 176D and 93A**

Chapter 93A makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a).  Chapter 176D sets forth various "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance." Mass. Gen. Laws ch. 176D, § 3.  Such practices include unfair claim-settlement practices, such as misrepresenting facts or insurance policy provisions; failing to affirm or deny coverage of claims in a timely manner; and failing to make reasonable settlement offers once liability has become reasonably clear. *See id.* § 3(9).

Chapter 176D does not create a private cause of action, and is enforceable only by the state commissioner of insurance.  Mass. Gen. Laws ch. 176D, § 6 (providing for enforcement by the Commissioner of Insurance); *see, e.g.*, *Metropolitan Prop. & Cas. Ins. Co. v. Boston Reg'l Physical Therapy, Inc.*, 538 F. Supp. 2d 338, 343 (D. Mass. 2008).  Thus, to proceed against an insurer on the basis of a violation of section 3(9) of chapter 176D, an insured must bring a claim under either section 9 or 11 of Chapter 93A.  *Fernando v. Fed. Ins. Co.*, 2019 WL 2267168, at *11 (D. Mass. May 28, 2019).

Count 2 alleges that "CNA's actions constitute a failure to effectuate prompt, fair and equitable coverage and settlement for the Plaintiff's claim in violation of [Mass. Gen. Laws ch.] 176D[,] §3(9)(f)," and that its actions in violation of chapter 176D also constitute a violation of Mass. Gen. Laws ch. 93A, § 9.  (Compl. ¶¶ 43-44).[2]

Count 2 specifically alleges that CNA's actions violate section 9 of Chapter 93A, often referred to as the "consumer" section of the statute, rather than section 11, the "business" section of the statute.  (Compl. ¶ 44).  *See e.g.*, *Kunelius v. Town of Stow*, 588 F.3d 1, 15-16 (1st Cir. 2009).  However, plaintiff does not appear to have sent the demand letter required by section 9.[3] In the absence of such a demand letter, plaintiff may not assert a claim under section 9.  *See City of Boston v. Aetna Life Ins. Co.*, 399 Mass. 569, 574 (1987) ("The failure of the City to allege the sending of a demand letter is fatal to its [Chapter 93A] § 9 claim.").[4]  "Th[at] statutory notice

---

[2] It is not clear whether plaintiff intends to assert a claim under Chapter 176D independently.  (*See* Compl. ¶ 43 ("CNA's actions constitute a failure to effectuate prompt, fair and equitable coverage and settlement for the Plaintiffs claim in violation of [Mass. Gen. Laws ch.] 176D, § 3(9)(f), for which CNA is liable to the Plaintiff in damages.")).  To the extent it seeks to do so, it fails to state a claim, as Chapter 176D does not create a private cause of action.

[3] At least 30 days prior to filing such a claim, a plaintiff is required to send "to any prospective respondent" a demand letter "identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered."  Mass. Gen. Laws ch. 93A, § 9(3).

[4] Moreover, even if plaintiff had sent the required letter, it is not clear that its claim could survive as a section 9 claim.  Whether a party engaged in trade or commerce may proceed against an insurance company under

requirement is not merely a procedural nicety, but, rather, 'a prerequisite to suit.' . . . [that] must be alleged in the plaintiff's complaint." *Rodi v. S. New England Sch. of L.*, 389 F.3d 5, 19 (1st Cir. 2004) (quoting *Entrialgo v. Twin City Dodge, Inc.*, 368 Mass. 812 (1975)).

Nonetheless, "[f]ederal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. Rule Civ. Proc. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). "[T]he failure to cite the proper statute is not fatal to the claim at the pleading stage." *Jones v. Hanna*, 2016 WL 11781884, at *1 (1st Cir. Mar. 28, 2016) (discussing dismissal of a Chapter 93A claim). Furthermore, defendant has opposed the claim on the merits, not on the technical ground that plaintiff asserted a claim under the wrong section of the statute. The Court will therefore assume that Count 2 was intended to assert a cause of action under Mass. Gen. Laws ch. 93A, section 11. *See N.E. Bridge Contractors, Inc. v. Sentry Ins.*, 652 F. Supp. 3d 225, 229-30 (D. Mass. 2023).

A plaintiff may assert a claim under section 11 for unfair and deceptive trade practices in connection with insurance claims-settlement practices, but "[u]nlike in the context of consumer plaintiffs under § 9, a violation of chapter 176D is only *evidence* of a violation of chapter 93A, § 11." *Peterborough Oil Co. v. Great Am. Ins. Co.*, 397 F.Supp.2d 230, 244 (D. Mass. 2005) (citing *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 754 (1993)); *Federal Ins. Co. v.*

---

Chapter 93 section 9 instead of section 11 is an unresolved question. *Compare* T. BILLINGS, *The Massachusetts Law of Unfair Insurance Claim Settlement Practices*, 76 Mass. L. Rev. 55, 59 (June, 1991) ("[A] literal reading of the statutes suggests that the private right of action for violation of chapter 176D, section 3(9), even though it is located within chapter 93A, section 9 (the 'consumer' section), exists in favor of consumers and nonconsumers alike."); *with Cook & Co., Inc. v. Matrix Risk Management Services, LLC*, 2011 WL 241966, at *9 (D. Mass. Jan. 24, 2011) ("The plain language of the statute makes clear the Cook Company and Cook Agency have no standing under Section 9 unless they are unable to sue under Section 11."); *see also River Farm Realty Tr. v. Farm Fam. Cas. Ins. Co.*, 943 F.3d 27, 37 (1st Cir. 2019) (treating a claim by a realty trust of a farm under § 9). The SJC has noted the issue twice, but declined to decide it on both occasions. *See Kiewit Const. Co. v. Westchester Fire Ins. Co.*, 878 F. Supp. 298, 301 (D. Mass. 1995) (citing *Boston Symphony Orchestra v. Commercial Union Ins. Co.*, 406 Mass. 7, 14 n.5 (1989); *City of Boston*, 399 Mass. 569).

*HPSC, Inc.*, 480 F.3d 26, 35 (1st Cir. 2007) ("A violation of General Laws chapter 176D,

§ 3 . . . is evidence of an unfair business practice under chapter 93A, § 2, which would give rise

to a cause of action under chapter 93A, § 11.").[5]

 The question is thus whether the conduct alleged in the complaint—the failure to

effectuate a prompt, fair, and equitable settlement of a claim in which liability has become

reasonably clear—is unfair or deceptive within the meaning of Chapter 93A. *See M. DeMatteo*

*Const. Co. v. Century Indem. Co.*, 182 F. Supp. 2d 146, 162 (D. Mass. 2001). (*See* Compl. ¶ 43

(citing Mass. Gen. Laws ch. 176D, § 3(9)(f))).

 A good-faith dispute over insurance coverage in which liability is "not reasonably clear"

cannot give rise to a violation of Chapters 93A and 176D. *Hampshire House Corp. v. Fireman's*

*Fund Ins. Co.*, 557 F. Supp. 3d 284, 301 (D. Mass. 2021). That is true even if a court ultimately

overrules the insurer's denial of a claim, as long as that denial was made in good faith, based

upon a plausible interpretation of the insurance policy, and was not otherwise immoral,

unethical, or oppressive. *See, e.g.*, *New England Envtl. Techs. v. Am. Safety Risk Retention Grp.,*

*Inc.*, 738 F. Supp. 2d 249, 259 (D. Mass. 2010) ("Because [the insurer] based its denial on a

plausible, albeit erroneous, interpretation of the policy language, its conduct did not constitute a

violation of Chapter 176D."); *Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*,

406 Mass. 7, 15 (1989) ("In good faith, [the insurer] relied upon a plausible, although ultimately

incorrect, interpretation of its policy. There is nothing immoral, unethical or oppressive in such

an action. . . . [The insurer] did not engage in unfair or deceptive acts in this case.").

 Here, defendant contends that "the allegations establish nothing more than a good-faith

---

[5] By contrast, "[a] consumer asserting a claim under [Mass. Gen. Laws ch.] 93A, § 9, may recover for violations of [Mass. Gen. Laws ch.] 176D, § 3, cl. 9, without regard to whether the violation was unlawful under [Mass. Gen. Laws ch.] 93A, § 2, because of the explicit statement to that effect in § 9." *Polaroid Corp.*, 414 Mass. at 754.

dispute over differing interpretations of the insurance policy." (Mem. at 7).  But the complaint in fact alleges something more.  It alleges, in substance, that defendant acted unfairly or deceptively by failing to "account for the fact that the only reason that mold is present in the Leased Premises is due to the introduction of raw sewage into the space and because [defendant] did not timely address or even raise this issue of the mold exclusion during the handling of the Loss." (Compl. ¶ 29).  Plaintiff contends that defendant has "opted to hide behind the minimal coverage of $25,000 under the Mold Limitation," even though the sewage "is in fact what caused the loss of the product in this claim—NOT the mold." (Opp. at 16 (citing Compl. ¶¶ 20, 21, 26, 28), Compl. ¶ 30).

Defendant further describes its actions as a result of "differing opinions regarding the nature of the loss" after each party tested the Phase III contents.  (Mem. at 7).  "Insurers are both encouraged and entitled to rely, as [defendant] did here, on the advice of expert consultants in evaluating liability." *Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, 169 F.3d 43, 56 (1st Cir. 1999).  If defendant reasonably relied on the diligent, good-faith evaluation of the warehouse by an expert, that is evidence of good faith. *See Hartford Cas. Ins. Co. v. New Hampshire Ins. Co.*, 417 Mass. 115, 123 n.5 (1994) (discussing reliance on attorney advice); *Golchin v. Liberty Mut. Ins. Co.*, 460 Mass. 222, 232 n.6 (2011); *Boston Symphony Orchestra, Inc.*, 406 Mass. at 14; *Van Dyke v. St. Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 677 (1983).

The complaint, however, alleges that the initial report by JS Held missed clear evidence of sewage contamination.  (Compl. ¶¶ 13-21).[6]  "It is one thing to rely in good faith on the advice

---

[6] On February 14, 2023, defendant hired Envirotech Laboratories, which detected sewage in the warehouse. (Compl. ¶ 13).  Between February 27, and March 23, 2023, JS Held detected sewage in the warehouse, including items that were visibly damaged.  (*Id.* ¶ 18).  The March 23, 2023 report of JS Held concluded that "additional cleaning and the removal of visible water damaged contends is recommended within the warehouse" but neither JS Held or defendant directed the removal of the remaining contents.  (*Id.*).  Sometime between March 23 and June 2023, Envirotest detected elevated microbial volatile organic compounds and "obvious mold and sewage remains."

of outside consultants; it is quite another to suggest that an insurer insulates itself from 93A liability merely because a hired expert maps its battle plan." *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 42 n.6 (1st Cir. 2000).

The reasonableness of the findings of JS Held is a question of fact. *See Kohl v. Silver Lake Motors, Inc.*, 369 Mass. 795, 799 (1976) ("A determination of reasonableness normally is a question of fact."). And according to the facts alleged, its evaluation was at least plausibly unreasonable. The complaint asserts that plaintiff was sufficiently concerned about the results of the JS Held report to hire its own expert. (Compl. ¶¶ 19, 25). And plaintiff's expert did in fact report the continued presence of sewage, a finding later confirmed by JS Held itself. (*Id.* ¶¶ 20-21). JS Held is also alleged to have admitted that it did not inspect certain boxes during its subsequent investigation. (*Id.* ¶ 21). Those plausible allegations are sufficient to call into question the reasonableness and fairness of JS Held's initial evaluation and defendant's subsequent decision to invoke the mold-exclusion provision.

Furthermore, there is a direct relationship between the presence of raw sewage and the presence and growth of mold. *See* ENV'T PROT. AGENCY, *Sanitary Sewer Overflow (SSO) Frequent Questions*, https://www.epa.gov/npdes/sanitary-sewer-overflow-sso-frequent-questions (accessed July 26, 2024) (noting that "[b]ecause S[anitary ]S[ewer ]O[verflows] contain raw sewage they carry bacteria, viruses, protozoa (parasitic organisms), helminths (intestinal worms), and inhaled molds and fungi"). Thus, there may be unfairness or deception in alleging that the presence of mold in the aftermath of a sewage spill justified the invocation of the mold-exclusion provision.

That is particularly true in light of the alleged delays in the process of assessing the

---

(*Id.* ¶ 20). Finally, in June 2023, JS Held "confirmed the findings of Envirotest" and adjusted its recommendation. (*Id.* ¶ 21).

contamination.  The complaint alleges that defendant at first denied that some portion of the warehouse contents was subject to coverage and, once it became clear that those contents were compensable, invoked the mold exclusion.  (Opp. at 10 ("[I]t took from March, 2023, to June, 2023, and the additional findings by Envirotest to obtain consensus that all of the product in the Leased Premises was contaminated and therefore worthless."  (citing Compl. ¶¶ 18, 21)); *see also* Opp. at 13).  Put simply, it is undisputed that the sewage spill itself gave rise to coverage; arguably, it was unfair and deceptive for the insurer to delay until the spill resulted in mold damage, and then to invoke the mold exclusion.

While Chapter 176D does not penalize insurers "who delay in good faith when liability is not clear and requires further investigation," an unjustified delay may lead to a different result. *Clegg v. Butler*, 424 Mass. 413, 421 (1997); *see, e.g.*, *R.W. Granger & Sons, Inc. v. J & S Insulation, Inc.*, 435 Mass. 66, 71 (2001) ("[T]here was no evidence to explain the delay of more than four months"); *Northern Sec. Ins. Co. v. R.H. Realty Tr.*, 78 Mass. App. Ct. 691, 697 (2011) ("[I]t intentionally delayed payment of its bills in the hope of unfairly securing an advantageous financial outcome."); *Vermont Mut. Ins. Co. v. Toland*, 2022 WL 4481508, at *6 (D. Mass. Sept. 27, 2022) ("[C]hapter 93A prevents insurers from delaying settlements and gambling on litigation to the detriment of the insureds").

The particulars of the raw sewage spill, and its relation to the mold, present questions of fact, and there are sufficient plausible allegations to suggest that it was unfair and deceptive for defendant to invoke the mold exclusion at the time it did so.  *See Peterborough Oil Co.*, 397 F. Supp. 2d at 244-45 (finding defendant not liable where "[i]ts position was supported by case law, and did not ignore either the clear terms of the policy language or any salient facts.").  "[T]he issue of bad faith[] will depend upon a factual determination of the [insurer's] knowledge and

intent," for which "[t]he evidence likely will focus on insurance industry practices in similar circumstances, expert testimony that the insurer violated sound claims practices, the [insurer's] field investigation, and advice given to the [insurer] on the probability of success at trial." *Bolden v. O'Connor Cafe of Worcester, Inc.*, 50 Mass. App. Ct. 56, 67, 67 n.16 (2000)); *see also South Worcester Cnty. Reg'l Vocational Sch. Dist. v. Utica Mut. Ins. Co.*, 2010 WL 3222015, at *1 (D. Mass. Aug. 13, 2010) ("Expert testimony may be necessary under some circumstances to establish that an insurer has breached a relevant duty or standard of care or to help determine whether an insurer acted in good faith.").

In short, the complaint raises factual issues that involve more than a mere policy interpretation dispute.  Under the circumstances alleged here, it is plausible that defendant's mold-exclusion invocation violated Chapters 176D and 93A.  Accordingly, the Court will deny the motion to dismiss as to Count 2.

### B.     Breach of Implied Covenant of Good Faith and Fair Dealing

Defendant also contends that the complaint fails to state a claim that it breached the implied covenant of good faith and fair dealing.  It asserts that the complaint's allegations are conclusory and that it fails to demonstrate how defendant's position was in bad faith.  (Mem. at 8).

Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract.  *See Uno Rests., Inc. v. Bos. Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).  That covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991) (quoting *Druker v. Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976)).  "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno*

13

*Rests.,* 441 Mass. at 385.

A party may breach the covenant without breaching any express term of the contract. *Marx v. Globe Newspaper Co.*, 2002 WL 31662569, at *5 (Mass. Super. Nov. 26, 2002); *see Fortune v. National Cash Register Co.*, 373 Mass. 96, 101, 105 (1977).  Otherwise, the implied covenant would be a mere redundancy.  *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005).  The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance.  *Marx*, 2002 WL 31662569, at *5-6; *Larson v. Larson*, 37 Mass. App. Ct. 106, 110 (1994).

However, the requirement of good-faith performance is circumscribed by the obligations in the contract.  *AccuSoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001).  The covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship.  *Uno Rests.*, 441 Mass. at 385-386.  Nor does the covenant apply where the defendant has exercised an express contractual power in good faith—that is, in a manner that comports with the parties' reasonable expectations as to performance.  *Speakman*, 367 F. Supp. 2d at 132 (collecting cases).

To establish a breach of the implied covenant, "a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *FabriClear, LLC v. Harvest Direct, LLC*, 481 F. Supp. 3d 27, 35 (D. Mass. Aug. 24, 2020) (quoting *Blake v. Pro. Coin Grading Serv.*, 898 F. Supp. 2d 365, 388 (D. Mass. 2012)).  "In determining whether a party violated the implied covenant of good faith and fair dealing, we

14

look to the party's manner of performance." *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 570 (2010) (citing *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005). Plaintiff has the burden of showing lack of good faith, which can be inferred from the totality of the circumstances. *T.W. Nickerson, Inc.*, 456 Mass. at 570 (2010); *Nile v. Nile*, 432 Mass. 390, 389-99 (2000).

First, it is undisputed that an insurance policy is a contract. *See Ken's Food, Inc. v. Steadfast Ins. Co.*, 491 Mass. 200, 201 (2023); *AIG Property Cas. Co. v. Cosby*, 892 F.3d 25, 27 (1st Cir. 2018) (noting that under Massachusetts law, an insurance policy is to be "construe[d] . . . under the general rules of contract interpretation.") (quoting *Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir. 2000)). Plaintiff alleges, and defendant does not appear to contest, that such an enforceable contract existed between the two parties. (Compl. ¶ 5; Mem. at 1-2).

Second, the complaint plausibly states that "the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *FabriClear, LLC*, 481 F. Supp. 3d at 35. Plaintiff contends that defendant has invoked the mold exclusion to deny coverage for items that were contaminated by raw sewage. (Compl. ¶¶ 20-21, 29-30). Defendant responds that it "relied on the findings of JS Held in applying the Policy's mold limitation," that it paid out more than one million dollars for the claim, and that plaintiff has failed to demonstrate how its position on its coverage is sufficient to trigger a bad-faith claim. (Mem. at 8).

While "the fact that an insurer contends coverage, without more, is not sufficient to prove a breach of the implied covenant of good faith and fair dealing, even if the insurer's position proves to be incorrect," here it is plausibly alleged that the denial was not in good faith. *NextSun*

15

*Energy Littleton, LLC v. Acadia Ins. Co.*, 494 F. Supp. 3d 1, 21 (D. Mass. 2020).

Chapter 93A and breach-of-implied-covenant claims often survive or fail together. *See Anthony's Pier Four*, 411 Mass. at 476; *Massachusetts Emps. Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995); *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 140 (D. Mass. 2005) (collecting cases); *New Kappa City Constr. v. Nat'l Floors Direct Inc.*, 2011 Mass. App. Div. 249, at *2 (Dist. Ct. 2011); *cf. PH Grp. Ltd. v. Birch*, 985 F.2d 649, 652 (1st Cir. 1993) ("Moreover, violations of ch. 93A must meet a higher standard of liability than do breaches of an implied covenant of good faith and fair dealing."). That is also the case here.

"A breach [of the implied covenant] occurs when one party violates the reasonable expectations of the other." *Chokel v. Genzyme Corp.*, 449 Mass. 272, 276 (2007). Given the parties' manner of performance, it appears that it was reasonable for plaintiff to expect that defendant would cover all products contaminated by sewage. It is alleged that did not occur. Under the facts presented, the complaint states that defendant "did something," namely deciding to invoke the mold exclusion with less than good faith, "that had the effect of destroying . . . [plaintiff's right] to receive the fruits of the contract. *FabriClear, LLC*, 481 F. Supp. 3d at 35. That is sufficient to state a claim for breach of the implied covenant. Accordingly, the motion to dismiss Count 4 will be denied.

## IV.    Conclusion

For the foregoing reasons, the motion to dismiss of defendant Continental Casualty Company is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  July 26, 2024                                   Chief Judge, United States District Court